# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

### NO. 03-17-00520-CR

**Gregory James Dalton, Appellant**

**v.**

**The State of Texas, Appellee**

---

### FROM THE DISTRICT COURT OF TRAVIS COUNTY, 403RD JUDICIAL DISTRICT
### NO. D-1-DC-15-301607, HONORABLE BRENDA KENNEDY, JUDGE PRESIDING

---

### M E M O R A N D U M   O P I N I O N

Gregory James Dalton was charged with the capital murder of Jose Chavez. *See* Tex. Penal Code §§ 19.02(b)(1), .03(a)(2) (stating that person commits murder "if he . . . intentionally or knowingly causes the death of an individual" and explaining that offense is capital murder if individual "intentionally commits the murder in the course of committing or attempting to commit . . . burglary [or] robbery"). At the end of the trial, the jury found Dalton guilty, and Dalton's punishment was automatically assessed at life imprisonment. *See id.* § 12.31 (stating that for capital-murder case in which State is not seeking death penalty, defendant will be sentenced to "life without parole, if the individual committed the offense when 18 years of age or older"). On appeal, Dalton challenges the sufficiency of the evidence supporting his conviction. We will modify the district court's judgment of conviction to correct a clerical error and affirm the judgment of conviction as modified.

## BACKGROUND

As set out above, Dalton was alleged to have committed the capital murder of Chavez, and Dalton was alleged to have committed the crime with the help of his two alleged accomplices, Jeffrey Mendez and Shawn Smith. The following summary comes from the testimony and other evidence presented at trial.

During the relevant time period, Dalton was living in San Antonio and was romantically involved with Franceska Santana. Similarly, Smith and Mendez were also living in San Antonio and were romantically involved with Shanell Sorrells and Yara Gomez, respectively. The Facebook pages of several of the individuals listed above indicated that the individuals were friends and engaged with one another socially. During that same time period, Chavez was living in an apartment in Austin along with his roommate Colton Titus and temporary guest Justin Lynch, and Chavez was selling illegal drugs out of his apartment. Mendez had purchased drugs from Chavez on more than one occasion and did so hours before Chavez's death.

Shortly after midnight on the night in question, there was a knock on the door of Chavez's apartment. After Titus answered the door, a man asked if "Joe" lived in the apartment, and Chavez told the man that he had the wrong apartment and closed the door. Following that exchange, Chavez went to his room to go to sleep. Shortly thereafter, two men wearing dark ski masks and carrying guns in their hands kicked in the apartment door, and one of the men asked, "Where are the drugs that we bought yesterday?" Then, Chavez came out of his room, and a struggle ensued resulting in Chavez being shot multiple times and succumbing to those injuries. After the shots were fired, the two assailants fled the apartment, and Lynch called 911.

2

During the months-long investigation of the crime, the police searched the phone that Chavez used primarily for the purpose of selling drugs in an effort to ascertain who may have had recent contact with Chavez and may have had a motive to steal from Chavez. After excluding several individuals, the police discovered text messages between Chavez and Mendez in the days leading up to the shooting.[1] In those communications, Chavez and Mendez discussed various drug deals, and Chavez provided Mendez with instructions to Chavez's home. In addition, the communications revealed that Mendez drove to Chavez's home hours before the incident. Moreover, the police examined the records for Mendez's phone and discovered that Mendez's phone connected with the cell towers that were closest to Chavez's home around the time of the murder and also communicated with several phones with San Antonio numbers around that same time.

In furtherance of the investigation, the police examined the cell phone records for the individuals with whom Mendez was communicating around the time of the shooting and discovered that Mendez was communicating with Dalton, Smith, and Gomez on the night in question. After examining the Facebook page for Smith, the investigating officers observed that Smith matched the description given by Titus of the individual who knocked on the door shortly before the incident, and

---

[1] During the trial, police officers involved in the investigation in this case discussed several phones that were examined in this case, including ones belonging to or affiliated with Chavez, Dalton, Mendez, Smith, Sorrells, Gomez, and Santana. Although the billing information for some of the phones did not correspond precisely to an individual listed in the previous sentence, the police were able to link the phones to the individuals listed above through other methods, including an examination of how, when, and where the phones were used and of the relationship between the individuals listed above and the individuals listed in the billing information. Moreover, Dalton does not challenge the sufficiency of the evidence establishing the identity of the users of the phones. Accordingly, for ease of reading, we will refer to the phones by their respective users rather than use the phone numbers themselves.

3

Titus later identified Smith as the knocker during a photo lineup. In addition, Titus testified that Smith was roughly the same size as and sounded like one of the masked individuals who broke into the apartment.

During their investigation of the various phone records, the police discovered that Mendez texted with Chavez regarding drug purchases in the weeks leading up to the incident, that Mendez would inform Chavez when he was heading to Austin, that Mendez texted Chavez hours before the incident to say that he was heading to Chavez's home, that Mendez's cell phone traveled to Austin on that day, and that Mendez's phone connected with the cell towers nearest to Chavez's home. Additionally, Mendez contacted Smith and Dalton after leaving Austin and returning to San Antonio, and the three phones started using the cell tower nearest to Mendez's home in San Antonio hours before the incident. Moreover, the records indicated that the three phones started traveling north approximately four and a half hours before the shooting because the phones were connecting with various cell towers between San Antonio and Austin, that the phones affiliated with Dalton and Mendez continued to be used while traveling north, that the activity on Smith's phone diminished for two hours, and that there was no contact between the three phones while the phones were traveling north. Further, the investigating officers testified that the records for this period in time were consistent with Smith driving Dalton and Mendez to Austin.

In addition, the records revealed that from approximately two and a half hours before the shooting to the time of the shooting, the phones belonging to Smith, Dalton, and Mendez were connecting with the cell towers nearest to Chavez's apartment but that Mendez did not inform Chavez that he was heading to Austin. Further, the records revealed that in the weeks leading up to

the offense, neither Smith's nor Dalton's phones had been to Austin. Moreover, the records showed that after the three phones arrived in Austin, Dalton, Smith, and Mendez began communicating with one another again. More specifically, Smith and Dalton did not communicate with one another in the hour and a half leading up to the incident, but Smith and Dalton both communicated with Mendez by phone multiple times. In addition, one of the investigating officers testified that these exchanges indicated that Dalton and Smith were together but that Mendez was not with them for that period of time even though he was in the same general area. Furthermore, the records showed that right around the time of the shooting Dalton's phone went off network because it was turned off, because its battery died, or because of some other connectivity issue. Additionally, the records demonstrated that Smith called Mendez multiple times after the shooting occurred, that Mendez's phone started connecting with other towers in the area indicating that he was driving, that Smith's phone went off network at some point after the shooting, that Mendez made multiple unsuccessful attempts to contact both Dalton and Smith, that Mendez eventually headed to San Antonio, and that Mendez texted Smith after Mendez arrived in San Antonio and asked whether "y'all get to get anything?"

Although the records for Dalton's phone indicated that his phone went off network around the time of the shooting, the records for Santana's phone demonstrated that she attempted to contact Dalton repeatedly after the shooting, that Santana received a phone call two hours after the shooting from a gas station in Austin approximately two and a half miles from Chavez's apartment, and that she called the gas station back when her phone was in Austin. Moreover, Santana testified that she was socializing with Dalton hours before the incident occurred, that Dalton left their home

5

at one point "later in the night," that she attempted to contact Dalton multiple times on the night in question, that he eventually called her from an Austin number, that Dalton asked her to pick him up in Austin because he was "stranded," and that she went to Austin to pick him up. Further, the records for Dalton's phone demonstrated that his phone went back on network near San Antonio approximately an hour after Santana arrived in Austin and that Dalton, Smith, and Mendez began contacting one another after Dalton arrived back in San Antonio. Additionally, the records for the three phones showed that later that morning all three phones synced up to the cell tower near Dalton's home.

Furthermore, although Smith's phone went off network at some point after the shooting, the records for his phone showed that the phone turned back on approximately two hours after the incident; that Smith was in Austin; that Smith sent a text message to Sorrells stating that "[s]hit went south, had to run, I'm at a Walmart in Austin trying to find [Mendez], he's in the car"; that Sorrells texted with Smith about cab prices from Austin to San Antonio; and that Smith arrived in San Antonio approximately four hours after the incident. Moreover, one of the investigating officers testified that Sorrells arranged for a cab to pick Smith up at a Walmart in Austin.

In addition to the testimony and evidence summarized above, both Smith and Mendez testified during Dalton's trial. In his testimony, Mendez explained that he had purchased drugs from Chavez in the past, that he went to Chavez's apartment a few times to make a purchase, that he went to Chavez's apartment a few hours before the incident to make a purchase, and that he went inside Chavez's room and noticed that there were drugs and money in the room. Further, Mendez testified that he called his friend Dalton after leaving Chavez's apartment to see "if

6

[Dalton] wanted to try to maybe make some quick money" by robbing Chavez, that Dalton and Smith agreed to participate, and that Smith offered to drive them to Austin in his car. Additionally, Mendez recalled that when the three of them arrived in Austin, they drove to an apartment complex near Chavez's apartment and that Smith and Dalton got out of the car to examine the area. Moreover, Mendez explained that Smith owned and carried a gun, that Smith and Dalton "dressed in all black," that Mendez elected to be the getaway driver because he did not want to be involved in the altercation, and that Smith called Mendez to say that he knocked on the door of the apartment, that someone answered, and that there were several people in the apartment. Further, Mendez testified that Dalton turned his phone off before heading inside Chavez's apartment.

Next, Mendez explained that he kept trying to get in contact with Smith and Dalton, that neither one of them answered their phones, that Mendez got frustrated, that Mendez drove back to San Antonio, and that Mendez texted Smith to ask if Dalton and Smith got anything from inside Chavez's apartment. In addition, Mendez related that Smith called later to see where Mendez was and that Smith stated that "stuff got messed up" when he went inside the apartment. Finally, regarding events occurring after the incident, Mendez testified that he went to Dalton's home the next day to talk about what happened, that Dalton stated that Santana drove to Austin to pick Dalton up, that Dalton and Smith fought with someone in the apartment, that a gun went off, and that Dalton and Smith "took off running."

After Mendez finished testifying, Smith was called to the stand. In his testimony, Smith explained that he met with Mendez and Dalton prior to the incident, that Mendez mentioned "an easy grab . . . to get some money" and drugs from Chavez, that Mendez went over the floor plan

7

of Chavez's apartment, that the three of them drove to Austin to "scope" out the apartment, and that Smith drove them to Austin in his car. Next, Smith stated that the three of them parked at an apartment complex near Chavez's apartment, that they walked to Chavez's apartment to check it out, that they went back to the car, that Mendez drove them to Chavez's apartment, that Smith got his revolver out of the trunk, that Dalton had a pistol that Mendez had given him earlier, that Smith put on some fishing gloves and a dark camouflage ski mask, and that Dalton put on a black ski mask that he brought with him.

Further, Smith related that he knocked on Chavez's apartment door and pretended to be looking for someone else, that Dalton's phone died, that Smith called Mendez to describe who was in the apartment, that Dalton and Smith returned to the apartment, that Dalton kicked the door in, that Dalton and Smith went into the apartment and asked where the drugs were, that Smith heard a gunshot, that Chavez struggled with Dalton to get control of the weapon, that Smith heard two more gunshots, that Smith tried to separate Chavez and Dalton, that the gun fell to the ground, that Smith picked the weapon up, and that Dalton and Smith ran out of the apartment. Regarding the events that occurred after the shooting, Smith testified that he called Mendez to come get them, that Mendez did not answer his phone, that Dalton told Smith to get rid of the weapon, that Smith threw the weapon away, that Dalton admitted to firing the weapon at the guy "coming at him," that Dalton and Smith ran from the apartment complex, that they got separated, that Smith tried to call Mendez, that Smith's phone died, that Smith walked to Walmart to buy a phone charger, that he called Mendez after his phone charged, that Mendez said that he was already in San Antonio, that he called Sorrells, that Sorrells ordered him a cab to take to San Antonio, and that Smith, Dalton, and Mendez all met hours later to discuss what happened.

8

After hearing the evidence presented at trial, the jury found Dalton guilty of the charged offense.

## DISCUSSION

**Corroboration of Accomplice Testimony**

On appeal, Dalton argues that the evidence presented at trial is legally insufficient to corroborate the accomplice testimony of Smith and Mendez. When presenting this issue on appeal, Dalton notes that no physical evidence (e.g., fingerprints or DNA) linked him to the scene of the offense, that the weapon used to shoot Chavez was never recovered, that Lynch and Titus could not identify the assailants because the assailants had ski masks on, that Lynch initially told the police that the assailants could have been Hispanic even though Dalton is African American, that Dalton's "phone was deactivated by an unknown means and was not used to contact the two accomplices until hours later when everyone was back in San Antonio," that attempts made by Mendez to contact Dalton after the incident were unsuccessful, that Dalton's phone was not turned back on until five hours after the incident, and that Dalton was not with Mendez or Smith when his phone reconnected with the network. In light of the preceding, Dalton contends that when the accomplice testimony is excluded, the remaining evidence does not sufficiently connect him to the murder of Chavez. In fact, Dalton contends that the evidence would support a conclusion that Dalton "decided not to participate in the offense," called Mendez "to tell him he was backing out, turned his cell phone off[,] and then left the scene before the murder occurred." As support for this proposition, Dalton asserts that the evidence shows that Dalton "cut off cell phone contact with Mendez and Smith" minutes before the offense, that the State failed to show that Dalton was with "Mendez or Smith at the time of the

9

offense," and that "there is no record of [Dalton]'s whereabouts in the five minutes or so before the offense and thus no proof whatsoever that he was part of this offense." For all of these reasons, Dalton insists that the evidence is insufficient to corroborate the testimony of Smith and Mendez.

In this case, the jury charge explained that Smith and Mendez were accomplices to the offense in question. *See Cocke v. State*, 201 S.W.3d 744, 748 (Tex. Crim. App. 2006) (providing that person indicted for same offense is accomplice as matter of law); *see also Medina v. State*, 7 S.W.3d 633, 641 (Tex. Crim. App. 1999) (noting that "[a] person is an accomplice if he participates before, during, or after the commission of the crime and can be prosecuted for the same offense as the defendant or for a lesser-included offense"). "A conviction cannot be had upon the testimony of an accomplice unless corroborated by other evidence tending to connect the defendant with the offense committed; and the corroboration is not sufficient if it merely shows the commission of the offense." Tex. Code Crim. Proc. art. 38.14. "When reviewing the sufficiency of non-accomplice evidence under article 38.14, we decide whether the inculpatory evidence tends to connect the accused to the commission of the offense." *Smith v. State*, 332 S.W.3d 425, 442 (Tex. Crim. App. 2011); *see Roys v. State*, 416 S.W.3d 229, 234 (Tex. App.—Amarillo 2013, pet. ref'd). In performing this analysis, "the reviewing court eliminates all of the accomplice testimony from consideration and then examines the remaining portions of the record." *Castillo v. State*, 221 S.W.3d 689, 691 (Tex. Crim. App. 2007). The non-accomplice evidence is viewed "in the light most favorable to the verdict," *Knox v. State*, 934 S.W.2d 678, 686 (Tex. Crim. App. 1996), and it "need not directly link the defendant to the crime" or "'establish his guilt beyond a reasonable doubt'" on its own, *Roys*, 416 S.W.3d at 234 (quoting *Castillo*, 221 S.W.3d at 691).

Although "the accused's mere presence in the company of the accomplice before, during, and after the commission of the offense is insufficient by itself to corroborate accomplice testimony, evidence of such presence, coupled with other suspicious circumstances, may tend to connect the accused to the offense." *Dowthitt v. State*, 931 S.W.2d 244, 249 (Tex. Crim. App. 1996). "Even apparently insignificant incriminating circumstances may sometimes afford satisfactory evidence of corroboration." *Id.* "The 'tends to connect' is not a high threshold." *Randall v. State*, 218 S.W.3d 884, 886 (Tex. App.—Houston [1st Dist.] 2007, pet. ref'd). "[W]hen there are two permissible views of the evidence (one tending to connect the defendant to the offense and the other not tending to connect the defendant to the offense), appellate courts should defer to that view of the evidence chosen by the fact-finder." *Simmons v. State*, 282 S.W.3d 504, 508 (Tex. Crim. App. 2009).

As set out above, Santana testified that she was with Dalton at their home prior to the incident, that Dalton left at some point in the evening, that she was unable to contact him until the following morning several hours after the shooting when Dalton called from a gas station in Austin, that she drove to pick Dalton up because he was "stranded" in Austin, and that she drove Dalton home. Further, the cell records for Dalton's phone revealed that his phone reconnected with the network after Santana picked him up and showed that the phone was near the outskirts of San Antonio when the phone turned on, and the time and location where Dalton's phone reconnected was consistent with someone who left Austin approximately an hour beforehand and was returning to San Antonio. Moreover, although Dalton's phone was disconnected from the network immediately prior to the shooting, the cell records for Dalton's, Smith's, and Mendez's phones all showed that the three phones were taken to the same location in San Antonio before the shooting, that the three

11

phones traveled to Austin, and that the three phones connected with the two cell towers nearest to Chavez's home. Furthermore, the records chronicled that Dalton, Mendez, and Smith were in the area near Chavez's home late at night, that Dalton and Smith had not traveled to Austin in the weeks leading up to the shooting, and that Mendez did not inform Chavez that he was coming to Austin even though that was his usual practice when seeking to purchase drugs from Chavez. Additionally, the records demonstrated that Smith's and Dalton's phones stopped communicating with one another but continued communicating with Mendez before the shooting, which one of the investigating officers testified indicated that Smith and Dalton were together before the shooting but that Mendez was separate from them. Further, the testimony at trial demonstrated that *two* assailants broke into Chavez's apartment right before the shooting, and Titus identified Smith as the person who knocked on the door prior to the door being kicked in and testified that Smith was similar in build to and sounded like one of the assailants. In addition, the records for Mendez's phone showed that Mendez was driving around shortly after the shooting, that Mendez tried unsuccessfully to contact Dalton and Smith after the shooting, that Mendez's phone traveled to San Antonio while Smith's phone remained in Austin, and that Mendez texted Smith's phone to ask if "y'all get to get anything" after the shooting. Finally, the records from Dalton's phone demonstrated that when his phone reconnected with the network, he started calling Smith and Mendez shortly thereafter, and the records for all three phones show that the phones were brought in close proximity and connected to the cell tower nearest to Dalton's home hours after the shooting.

In light of the evidence regarding the cell phone records as well as the testimony from the witnesses at trial, including Santana and Titus, we believe that the non-accomplice evidence is

12

sufficient to link Dalton to the crime in question, and to the extent that the non-accomplice evidence could support conflicting inferences, we must defer to the jury's resolution of the evidence in favor of conviction. Accordingly, viewing the evidence in the light most favorable to jury's verdict, we conclude that the evidence is sufficient to corroborate the accomplice testimony from Smith and Mendez. *Cf. Fisher v. State*, No. 09-11-00379-CR, 2012 WL 5450828, at *12 (Tex. App.—Beaumont Nov. 7, 2012, no pet.) (mem. op., not designated for publication) (noting that "[t]he cell phone record evidence established a detailed history of various calls to and from the parties' cell phones at specific times and pinging off of the same cell towers to corroborate that the parties were travel[]ing together and communicating in concert with each other on the night of the robbery and murder, in the vicinity of the crime and to and from north Houston, where the parties originated and planned their crime spree" and concluding that "[t]he cell phone records, testimony regarding the location of the cell towers being accessed by the parties' cell phones on the night of the murder, and the testimony of" witness that he heard one of three alleged assailants mention something indicating possibility of robbery being committed in future was "sufficient to corroborate the testimony of Manning and Poledore regarding Fisher's involvement in the murder").

For these reasons, we overrule Dalton's issue on appeal.

**Clerical Error**

In addition to filing its appellee's brief, the State filed a motion asserting that there is a clerical error in the district court's judgment of conviction. Specifically, the State contends that although Dalton was charged with capital murder, although the jury determined that Dalton was guilty of capital murder, and although the district court's judgment of conviction specifies that the

offense falls under the statute governing capital murder, *see* Tex. Penal Code § 19.03(a)(2), the judgment of conviction states that the degree of the offense is a first-degree felony rather than a capital-felony offense, *see id.* § 19.03(b) (stating that offense under section 19.03 "is a capital felony"). For that reason, the State requests that this Court modify the portion of the judgment of conviction specifying the degree of the offense for which Dalton was convicted.

This Court has the authority to modify incorrect judgments when it has the information necessary to do so. *See* Tex. R. App. P. 43.2(b); *Bigley v. State*, 865 S.W.2d 26, 27-28 (Tex. Crim. App. 1993). Accordingly, we grant the State's motion and modify the judgment of conviction to reflect that Dalton was convicted of a capital-felony offense.

## CONCLUSION

Having determined that there is a clerical error in the judgment of conviction and having overruled Dalton's sole issue on appeal, we modify the district court's judgment of conviction to reflect that Dalton was convicted of a capital felony and affirm the district court's judgment of conviction as modified.

_____

David Puryear, Justice

Before Justices Puryear, Goodwin, and Bourland

Modified and, as Modified, Affirmed

Filed:   October 23, 2018

Do Not Publish

14